`                                                    [PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 23-10128

_____

AMIR M. MESHAL,

                                            Plaintiff-Appellee,

*versus*

COMMISSIONER, GEORGIA DEPARTMENT OF PUBLIC
SAFETY,
JOSHUA J. JANUFKA,
KEITH OGLESBY,

                                            Defendants-Appellants,

DERRICK FRINK,

                                            Defendant.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 4:22-cv-00010-RSB-CLR

_____

Before JILL PRYOR, BRANCH, and ED CARNES, Circuit Judges.

JILL PRYOR, Circuit Judge:

Georgia State Police officers stopped Amir Meshal, a professional truck driver, for a minor traffic infraction. During the stop, the officers received notice that Meshal was on the FBI's No Fly List. Despite clear language on the notice instructing the officers not to detain Meshal based on his presence on the list, they handcuffed him and placed him in the back of a patrol car while they sought and waited for guidance from the FBI. While they waited, the officers searched the inside of Meshal's truck and questioned him about his religion and his international travel. After determining that his truck was free of contraband and receiving the all-clear from the FBI, the officers released Meshal with a warning citation for the original infraction. He was detained for 91 minutes in total.

Following his release, Meshal sued the officers in federal court, alleging that they violated his Fourth Amendment rights by unlawfully extending the traffic stop and searching his truck. The officers moved to dismiss the complaint on qualified-immunity grounds, arguing that Meshal failed to allege a violation of clearly established law. The district court rejected this argument,

concluding that the complaint adequately alleged that the officers detained Meshal without arguable reasonable suspicion and searched his truck without arguable probable cause. The officers brought this interlocutory appeal to challenge the district court's denial of qualified immunity.

We agree with the district court that the officers are not entitled to qualified immunity at this stage. Given Meshal's specific allegations of fact, including a warning to the officers that he should not be detained on account of his no-fly status and the absence of any indication that he was engaged in criminal activity, the officers lacked even arguable reasonable suspicion to justify prolonging the traffic stop beyond the time it took to complete tasks incident to the traffic stop. We therefore affirm the district court's denial of qualified immunity.

## I.    BACKGROUND

### A.    Meshal's Detention

Meshal was driving northbound through Georgia in his semi truck with no trailer attached when he was stopped by Joshua Janufka, an officer with the Georgia State Patrol. After collecting Meshal's license and registration, Janufka explained that he had pulled Meshal over for following too closely behind another vehicle and that he would issue a courtesy warning in lieu of a ticket. Because it was raining, Janufka suggested that they continue their conversation in his patrol car. Meshal obliged, entering the front passenger seat of the patrol car shortly before another officer, Keith Oglesby, pulled up to the scene.

Once Meshal was inside the patrol car, Janufka asked him "a series of questions that [Meshal] understood to be standard questions that truck drivers are asked during traffic stops to ensure that they are following regulations." Doc. 1 at 4.[1] In response, Meshal explained that he had just picked up a load in Delaware, dropped it off in Miami,[2] and spent two nights with his mother elsewhere in Florida before driving to New Jersey—where he was headed when he was pulled over. He then showed Janufka a "bill of lading containing information about the load" he had just delivered. *Id.* When Janufka asked Meshal if he had ever been arrested, Meshal replied that "he had been arrested a long time ago and could not remember what for, but that it was probably for driving with a suspended license." *Id.* at 5.

At this point, Janufka asked twice for consent to search Meshal's truck, and Meshal declined both times, prompting Janufka to call for a K9 unit. Janufka then asked Meshal to exit the vehicle, explaining that "[s]omething was wrong" and that he needed to detain Meshal as a result. *Id.* After patting Meshal down and confiscating his cell phone, Janufka handcuffed him and placed him in the back of the patrol car, stating "you're not under arrest but I have

---

[1] "Doc." refers to the district court's docket entries.

[2] The complaint states that Meshal was pulled over as he was "returning home after delivering equipment for the halftime show of Super Bowl LIV at Hard Rock Stadium in Miami Gardens, Florida." Doc. 1 at 4. The stop occurred about a week before the Super Bowl. It is unclear from the complaint whether Meshal provided the officers with this detailed information or merely told them that he had dropped off a load "in Miami." *Id.*

to detain you." *Id.* at 5–6. When Meshal asked to use the restroom, Janufka told him to "just hang tight" and closed the patrol car's door. *Id.* at 6. By this time, approximately 30 minutes had passed since Meshal was pulled over.

From his new vantage point in the patrol car's back seat, Meshal could see Janufka's computer screen, where he spotted the word "Terrorist." *Id.* When Janufka returned to the patrol car to tell Meshal that "narcotics- and explosives-detecting canine teams were on their way," Meshal asked "if he was being detained because he is on a watchlist." *Id.* Janufka responded, "Exactly. So, you know what's going on?" Meshal then "explained that he had been detained in 2007 in Somalia by Kenyan authorities working with federal law enforcement agencies, and that he ended up on the No Fly List after refusing the FBI's requests to work as an informant." *Id.* Janufka responded, "This is over my head. I'm getting instructions on what to do." *Id.*

As they waited for the K9 officers to arrive, Janufka continued to pepper Meshal with questions, including whether he had any "explosives, narcotics, marijuana, weapons, cocaine, large amounts of cash, or anything else that law enforcement should be concerned about in his truck." *Id.* at 7. Meshal said no, and Janufka explained that, in addition to waiting for the K9 officers, Janufka was "'waiting on a phone call from the FBI' for guidance about whether [he] should arrest [Meshal]." *Id.*

Approximately 30 minutes after Meshal was placed in the back of Janufka's patrol car—about an hour after Meshal was pulled

over—Chatham County Sheriff's Deputy Derrick Frink and another K9 officer arrived at the scene. When an initial exterior dog sniff failed to indicate the presence of drugs or explosives in Meshal's truck, Frink walked back to the patrol car to get Janufka. Janufka then watched as Frink "opened the passenger side door of the semi-truck," "physically lifted his dog into the cabin of the vehicle," and "entered the truck himself" for "approximately a minute and a half," "with no apparent positive indication from the dog." *Id.* at 7–8. Once Frink emerged from the cabin, the second K9 officer conducted yet another dog sniff around the exterior of the truck—again, to no avail. At this point, the officers let Meshal out of the patrol car, but he remained in handcuffs.

Having found no evidence of drugs or explosives in the truck, Frink and the other K9 officer departed, and Janufka explained to Meshal that they were now "just waiting on a call from the FBI." *Id.* at 8. In the meantime, Janufka asked Meshal "more questions about his religious background and travels abroad"—a conversation that lasted "approximately ten to fifteen minutes." *Id.* Then, either Janufka or Oglesby walked away to take a call before returning to tell Meshal that he was free to go. Janufka removed Meshal's handcuffs, handed him a written warning for following too closely, and drove off. All told, Meshal was detained for "approximately one hour and thirty-one minutes," about an hour of which was spent in handcuffs, mostly in the back of Janufka's patrol car. *Id.* at 9.

## B.    Meshal's Presence on the No Fly List

Meshal alleged that he has been on the No Fly List since "at least 2009," despite having petitioned multiple times to be removed. Doc. 1 at 6. The No Fly List is a subset of the Terrorist Screening Database, also known as the terrorist watchlist. The National Crime Information Center (NCIC) allows state and local law enforcement officers to search for individuals by name to see if they are on the No Fly List. If they are, NCIC sends an automated message to the officer disclosing that the individual is on the list, but it does not explain the reason why.

According to the complaint, when an individual is on the watchlist but is not subject to an active arrest warrant or an immigration detainer, the inquiring officer receives an NCIC notice that reads:

> ***LAW ENFORCEMENT SENSITIVE
> INFORMATION***
>
> DO NOT ADVISE THIS INDIVIDUAL THAT THEY MAY BE ON A TERRORIST WATCHLIST. CONTACT THE TERORRIST SCREENING CENTER (TSC) AT (866) XXX-XXXX DURING THIS ENCOUNTER. **IF THIS WOULD EXTEND THE SCOPE OR DURATION OF THE ENCOUNTER CONTACT THE TSC IMMEDIATELY THEREAFTER.** IF YOU ARE A BORDER PATROL OFFICER, IMMEDIATELY CALL THE NTC.
>
> ATTEMPT TO OBTAIN SUFFICIENT IDENTIFYING INFORMATION DURING THE

ENCOUNTER, **WITHOUT OTHERWISE EXTENDING THE SCOPE OR DURATION OF THE ENCOUNTER**, TO ASSIST THE TSC IN DETERMINING WHETHER OR NOT THE NAME OR IDENTIFIER(S) YOU QUERIED BELONGS TO AN INDIVIDUAL IDENTIFIED AS HAVING POSSIBLE TIES WITH TERRORISM.

**DO NOT DETAIN OR ARREST THIS INDIVIDUAL UNLESS THERE IS EVIDENCE OF A VIOLATION OF FEDERAL, STATE OR LOCAL STATUTES.**

UNAUTHORIZED DISCLOSURE IS PROHIBITED.

INFORMATION THAT THIS INDIVIDUAL MAY BE ON A TERRORIST WATCHLIST IS PROPERTY OF THE TSC AND IS A FEDERAL RECORD PROVIDED TO YOUR AGENCY THAT MAY NOT BE DISSEMINATED OR USED IN ANY PROCEEDING WITHOUT THE ADVANCE AUTHORIZATION OF THE TSC.

WARNING – APPROACH WITH CAUTION.

***LAW ENFORCEMENT SENSITIVE INFORMATION***

*Id.* at 14 (emphasis added in complaint). Janufka received this notice when he stopped Meshal and queried his name through the NCIC.

## C.    Procedural History

Meshal sued Janufka, Oglesby, Frink, and Christopher Wright, the Commissioner of the Georgia Department of Public Safety, under 42 U.S.C. § 1983. He alleged that these defendants violated his Fourth Amendment rights by unlawfully extending the traffic stop (Count One) and unlawfully searching his truck without probable cause (Count Two). He sought both monetary and equitable relief, including a "a declaratory judgment establishing that [Meshal's] inclusion on the consolidated federal watchlist or any subset of the watchlist does not in itself constitute reasonable suspicion or probable cause to stop or arrest [him]." Doc. 1 at 17.[3]

Janufka, Oglesby, and Wright quickly moved to dismiss the case on qualified immunity grounds,[4] arguing that Meshal had not sufficiently alleged that the stop or the search of his truck amounted to a Fourth Amendment violation and that he failed to identify clearly established law establishing any violation. The district court rejected these arguments, concluding that, accepting the complaint's well-pleaded allegations as true, the officers lacked both arguable reasonable suspicion to extend the stop and arguable probable cause to search the truck. And the court concluded that

---

[3] The district court ruled that the Eleventh Amendment prevented Meshal from suing Janufka and Oglesby for damages in their official capacities. But the court concluded that the requested declaratory judgment was prospective equitable relief aimed at preventing ongoing constitutional violations, which was permitted by *Ex parte Young*, 209 U.S. 123 (1908).

[4] Frink did not join the motion to dismiss and is not a party to this appeal.

both requirements were clearly established at the time of the traffic stop. Janufka, Oglesby, and Wright challenge the denial of qualified immunity in this interlocutory appeal.

## II.    STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of qualified immunity at the motion-to-dismiss stage. *See Leslie v. Hancock Cnty. Bd. of Educ.*, 720 F.3d 1338, 1343 (11th Cir. 2013). Generally, a motion to dismiss on qualified-immunity grounds should be granted only "when the complaint fails to allege the violation of a clearly established constitutional right." *Corbitt v. Vickers*, 929 F.3d 1304, 1311 (11th Cir. 2019) (internal quotation marks omitted). Appellate review of a motion-to-dismiss denial is "limited to the four corners of the complaint," and this Court must "accept[] all the facts alleged in the complaint as true and draw[] all reasonable inferences in the plaintiff's favor." *Id.* (internal quotation marks omitted). The district court's qualified-immunity ruling should be reversed only if the existence of the affirmative defense of qualified immunity "clearly appears on the face of the complaint." *See Fortner v. Thomas*, 983 F.2d 1024, 1028 (11th Cir. 1993) (internal quotation marks omitted).

## III.    DISCUSSION

Meshal alleged that the officers violated his constitutional rights in two ways: first, by detaining him beyond the scope of the initial traffic stop, and second, by searching the inside of his truck. The officers argue that they are shielded from these claims by qualified immunity. We begin by considering the officers' qualified

immunity argument with respect to Meshal's prolonged detention before shifting our focus to the search of his truck. Ultimately, we are not persuaded that qualified immunity applies to either claim at this stage of the proceedings.

## A.  The officers are not entitled to qualified immunity for extending the traffic stop's duration.

"Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Bailey v. Wheeler*, 843 F.3d 473, 480 (11th Cir. 2016) "To invoke qualified immunity, a public official must first demonstrate that he was acting within the scope of his or her discretionary authority." *Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017). Discretionary authority encompasses "all actions of a governmental official that (1) were undertaken pursuant to the performance of his duties, and (2) were within the scope of his authority." *Id.* (internal quotation marks omitted). If the official satisfies this requirement, the burden shifts to the plaintiff to demonstrate that qualified immunity is inappropriate. To do this, he must "plead[] facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).

Meshal does not dispute that the officers were acting within the scope of their discretionary authority when they detained him. The remaining questions are whether the complaint sufficiently alleged that the officers violated Meshal's Fourth Amendment rights

by extending the duration of the traffic stop and whether those rights were clearly established at the time of the alleged violation. We address each of these questions in turn.

1.    The complaint sufficiently alleged that the officers violated Meshal's Fourth Amendment rights by extending the traffic stop's duration.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." *Whren v. United States*, 517 U.S. 806, 809–10 (1996). "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures," *Rodriguez v. United States*, 575 U.S. 348, 350 (2015), unless that extension was supported by reasonable suspicion of other criminal activity, *United States v. Perkins*, 348 F.3d 965, 970 (11th Cir. 2003).

Meshal's complaint alleged that Janufka stopped him for "following too closely" and almost immediately informed him that he would be issued "a courtesy warning" instead of a ticket. Doc. 1 at 4. After discovering that Meshal was on the No Fly List, however, Janufka and the other officers extended his seizure for a total of an hour and a half—far longer than it should take to complete a simple traffic stop absent arguable reasonable suspicion of other

criminal activity by Meshal. *Cf. United States v. Purcell*, 236 F.3d 1274, 1277–79 (11th Cir. 2001) (concluding that it was not facially unreasonable for an officer to spend 14 minutes writing a courtesy warning and running computer checks).

The officers insist that the extension was justified for two reasons. First, they argue that "officers may detain a driver after a traffic stop for as long as it takes the officers to complete 'tasks tied to the traffic infraction.'" Appellants' Br. 20 (quoting *Rodriguez*, 575 U.S. at 354). And because calling the FBI and waiting for a response was simply an "ordinary inquir[y] incident to the traffic stop"—like "determining whether there are outstanding warrants against the driver"—Meshal's prolonged detention was reasonable. *Id.* at 20–21 (quoting *Rodriguez*, 575 U.S. at 355). Second, the officers argue that Meshal's detention was justified because the officers reasonably suspected that he was engaged in criminal activity unrelated to the traffic stop.

Neither of these arguments persuades us. First, the officers' call to the FBI was not an ordinary inquiry incident to the traffic stop for following another vehicle too closely and was not plausibly related to the mission of that stop. Second, the officers lacked an independent basis to extend the traffic stop because they cannot point to specific and articulable facts in the allegations before us that provide anything more than an inchoate and unparticularized suspicion or hunch that Meshal was involved in some kind of terrorist activity.

(a)      *The officers were conducting no ordinary inquiry incident to the mission of the traffic stop when they called the FBI.*

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's mission—to address the traffic violation that warranted the stop and attend to related safety concerns." *Rodriguez*, 575 U.S. at 354 (internal citation and quotation marks omitted). "Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to the traffic stop," such as "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* at 355 (alteration adopted) (internal quotation marks omitted). Such inquiries are permitted under the authority of the original stop because they "serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly." *Id.* Still, "[t]he scope of the detention must be carefully tailored to its underlying justification" and may "last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983) (plurality opinion). "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Rodriguez*, 575 U.S. at 354.

The officers argue that, even without an independent basis to extend the stop, "the probable cause for [the] original traffic stop itself allowed the officers to" detain Meshal until the FBI gave the all-clear "because that process was a routine part of a traffic stop." Reply Br. 8. Contacting the FBI to inquire about Meshal's presence

on the No Fly List, they say, was "not unlike a routine check for 'warrants against the driver' because they both serve the same objective: 'ensuring that vehicles on the road are operating safely and responsibly.'" *Id.* (quoting *Rodriguez*, 575 U.S. at 355).

Supreme Court precedent compels us to disagree. Detaining Meshal for over an hour after checking his license and registration and learning that there was no warrant against him is neither routine nor ordinary.[5] *See Rodriguez*, 575 U.S. at 354–55 (noting that a traffic stop's mission includes "address[ing] the traffic violation" as well as performing *"ordinary* inquiries incident to the traffic stop" (emphasis added) (internal quotation marks omitted)).

The officers are correct that *Rodriguez* did not purport to provide an "exhaustive" list of permitted ancillary activities. But the officer's call to the FBI did not relate to the "enforcement of the traffic code" or otherwise "ensuring that vehicles on the road are operated safely and responsibly." *Id.* at 355. Unlike warrant checks, which "make[] it possible to determine whether the apparent traffic violator is wanted for one or more previous *traffic offenses*," a call to the FBI would hardly be expected to turn up any information concerning Meshal's ability to drive safely and obey the traffic code. *Id.* (emphasis added) (internal quotation marks omitted). The FBI call "lack[ed] the same close connection to roadway safety as the ordinary inquiries" discussed in *Rodriguez*; thus, it "cannot be

---

[5] The complaint does not specify exactly when the officers contacted the FBI, but it alleges that Meshal was handcuffed and placed in the back of Janufka's patrol car approximately 30 minutes into the 91-minute stop.

fairly characterized as part of the officer[s'] traffic mission." *United States v. Campbell*, 26 F.4th 860, 882 (11th Cir. 2022) (en banc) (internal quotation marks omitted). Instead, based on the allegations in the complaint, which we accept as true at this stage of the proceedings, the officers were attempting to investigate suspected criminal activity—indeed, suspected terrorist activity—that was far beyond the scope of the original traffic stop. *See id.* ("[R]elated tasks are the ordinary inquiries incident to a traffic stop, while unrelated tasks are other measures aimed at detecting criminal activity more generally." (internal quotation marks omitted)).

But even assuming the officers are right that the FBI call and response served the mission of the traffic stop in the same way that a warrant check would, the call extended Meshal's detention beyond what the Fourth Amendment allows. We have recognized that even related inquiries like a criminal record request "might lengthen a traffic stop beyond what is reasonable in a particular case," and that "[a]fter a certain point, this might constitute an unreasonable detention." *Purcell*, 236 F.3d at 1279. Although "a 30-minute wait for a computer check during a traffic stop" may be reasonable, "longer traffic stops, during which nothing occurred to justify the additional detention, usually require extenuating circumstances to be upheld." *United States v. Simmons*, 172 F.3d 775, 780 (11th Cir. 1999); *see also United States v. Place*, 462 U.S. 696, 709–10 (1983) (stating that 90 minutes is probably too long for a *Terry* stop). The officers maintain that the length of the detention was dictated by the timing of the FBI's response and therefore justified. But what if the FBI had taken two hours to respond? Or six hours?

Or a whole day? It cannot be that any length of detention was permissible until the officers received an all-clear from the FBI. Our conclusion that the 91-minute traffic stop went beyond the permissible scope absent reasonable suspicion of illegal activity is bolstered by Meshal's allegation that the NCIC notice directed the officers not to detain him based on the No Fly List and to call *after* the traffic stop was over.

Without reasonable suspicion of other criminal activity, the officers' seizure of Meshal beyond the time it took to issue a courtesy warning and make "ordinary inquiries incident to the traffic stop" was an unreasonable seizure in violation of the Fourth Amendment. *Rodriguez*, 575 U.S. at 355 (alteration adopted) (internal quotation marks omitted).

> (b)    *Based on the allegations in the complaint, the officers lacked reasonable suspicion to extend the traffic stop.*

"A traffic stop may be prolonged where an officer is able to articulate a reasonable suspicion of other illegal activity beyond the traffic offense." *Perkins*, 348 F.3d at 970. Although "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "The officer must be able to articulate more than an inchoate and unparticularized suspicion or hunch of criminal activity." *Id.* at 123–24 (internal quotation marks omitted). Instead, he must "point to specific and articulable facts which, taken together with rational

inferences from those facts, reasonably warrant the intrusion." *United States v. Caraballo*, 595 F.3d 1214, 1222 (11th Cir. 2010) (alteration adopted) (internal quotation marks omitted). Ultimately, the question is whether "under the totality of the circumstances, from the collective knowledge of the officer[s] involved in the stop, [they] had an objectively reasonable suspicion that [the suspect] had engaged in a crime." *Id.* (alterations adopted) (internal quotation marks omitted). Notably, however, the reasonable suspicion standard "does not require officers to catch the suspect in a crime." *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008) (internal quotation marks omitted). Indeed, "reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *Id.* (internal quotation marks omitted).

The officers point to three facts alleged in the complaint that they say provided reasonable suspicion to extend the stop: (1) Meshal's placement on the No Fly List, (2) Meshal's past arrest for driving with a suspended license, and (3) Meshal's recent delivery to Miami, the site of the upcoming Super Bowl. Without more, however, these facts—individually or in concert—failed to provide the officers with reasonable suspicion to convert Meshal's routine traffic stop into a 91-minute detention.

To start, the officers' reliance on Meshal's no-fly status is contradicted by the text of the NCIC notice itself, which specifically instructed the officers to wait until *after* the traffic stop to call the TSC if doing so "would extend the scope or duration of the encounter." Doc. 1 at 14 (capitalization removed). The notice also

clarified that any attempts to gather identifying information on Meshal should be limited to the timeframe required by the stop's original purpose. And, if that were not clear enough, the notice warned the officers "not [to] detain or arrest [Meshal] unless there [was] evidence of a violation of federal, state[,] or local statutes." *Id*. (capitalization removed).

The officers' reliance on Meshal's "criminal history" and his recent delivery to the site of the Super Bowl is even weaker. To start, the officers do not even attempt to explain how Meshal's arrest "a long time ago," reportedly for driving with a suspended license, *Id*. at 5, indicated that "criminal activity [was] afoot," *Wardlow*, 528 U.S. at 123, especially because Meshal readily provided a current driver's license during the stop and had no outstanding warrants. Nor are the officers able to articulate what was so suspicious about Meshal, a professional truck-driver, making a delivery to Miami, which happened to be the site of the Super Bowl scheduled to take place more than a week later. Even more, Meshal showed Janufka a "bill of lading containing information about the load," which supported his story. Doc. 1 at 4. Ultimately, based on the complaint's allegations, we are compelled to conclude that the officers had nothing more than "an inchoate and unparticularized suspicion or hunch of criminal activity," *Wardlow*, 528 U.S. at 24 (internal quotation marks omitted), which could not justify Meshal's 91-minute detention.

The officers disagree. They urge us to consider each fact in tandem—not in isolation—and give "'due weight to the officer[s']

experience' in ferreting out 'wrongdoing.'" Reply Br. 7 (quoting *United States v. Braddy*, 11 F.4th 1298, 1311 (11th Cir. 2021)). Even in concert, however, the officers' justifications fall short.

It is true that "factors not in themselves proof of illicit conduct and/or quite consistent with innocent travel can, when taken together, give rise to a reasonable suspicion of criminal or drug activity." *United States v. Tapia*, 912 F.2d 1367, 1370 (11th Cir. 1990). But the officers' suspicions based on the facts alleged here amount to little more than a generalized concern that individuals added to the No Fly List might commit terrorist acts anytime they venture out. Although the officers stress that Meshal was returning from the future site of the Super Bowl—"arguably the most visible and high-target event on the American calendar," Appellants' Br. 21—their argument has no apparent limiting principle. To be sure, the Super Bowl would appear to be an attractive target for would-be terrorists. But so too would schools, supermarkets, malls, places of worship, nightclubs, government buildings, and downtown areas—all places where terrorist attacks have occurred. The logical implication of the officers' argument is that individuals on the No Fly List can be subjected to prolonged detention any time they travel to or from a public place. We cannot countenance that result. *Cf. United States v. Boyce*, 351 F.3d 1102, 1109 (11th Cir. 2003) (cautioning that factors that "would likely apply to a considerable number of those traveling for perfectly legitimate purposes . . . do not reasonably provide suspicion of criminal activity" (alterations adopted) (internal quotation marks omitted)). We therefore

conclude that Meshal's complaint sufficiently alleged a violation of his Fourth Amendment rights.

    2.    Meshal's rights were clearly established.

Plausibly alleging a constitutional violation is only half the battle. To overcome qualified immunity, Meshal must also show that the right in question was "clearly established at the time of the challenged conduct." *al-Kidd*, 563 U.S. at 735 (internal quotation marks omitted). The "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted." *Plowright v. Miami Dade Cnty.*, 102 F.4th 1358, 1366 (11th Cir. 2024) (internal quotation marks omitted).

"A law enforcement official who reasonably but mistakenly concludes that reasonable suspicion is present is still entitled to qualified immunity." *Jackson v. Sauls*, 206 F.3d 1156, 1165–66 (11th Cir. 2000). "When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Id.* If the officers had arguable reasonable suspicion, then "their violation of the law was not clearly established." *Edgar v. McCabe*, 84 F.4th 1230, 1236 (11th Cir. 2023). Thus, the question is whether, under Meshal's version of events, the officers lacked even *arguable* reasonable suspicion for their actions. Meshal has met this burden.

At the motion-to-dismiss stage, to determine whether the officers had arguable reasonable suspicion, we must take the

allegations in the complaint as true and analyze whether, under the facts as alleged, "a reasonable officer could have believed that the [stop] comported with the Fourth Amendment." *Brent v. Ashley*, 247 F.3d 1294, 1303 (11th Cir. 2001) (internal quotation marks omitted). In doing so, we "must examine the totality of the circumstances to determine whether an officer had a 'particularized and objective' basis to support his suspicion. Whether the officer's suspicion ends up being mistaken is immaterial so long as it was reasonable." *Whittier v. Kobayashi*, 581 F.3d 1304, 1309 (11th Cir. 2009) (internal citation omitted).

Here, based on the facts as alleged in the complaint, a reasonable police officer could not have believed that Meshal's long-ago arrest for driving with a suspended license, his delivery trip to Miami, and his mere presence on the No Fly List were sufficient to detain him for more than an hour and a half. This is especially true given the alleged numerous, explicit warnings in the same NCIC notice that flagged Meshal's no-fly status. As the district court aptly put it, "[t]he Complaint plausibly allege[d] that the officers merely equated Meshal's presence on the list to ambiguous criminal activity, which they believed they were at liberty to investigate without regard for Meshal's constitutionally protected rights." Doc. 36 at 26. That belief was not only wrong—it was unreasonable.

Moreover, binding precedent featuring materially similar facts clearly established that the officers violated Meshal's Fourth Amendment rights by extending the stop, without reasonable suspicion of other criminal activity, beyond the time it took for them

23-10128                Opinion of the Court                      23

to conduct tasks incident to the stop. *See Rodriguez*, 575 U.S. at 351–53, 356 (concluding that an officer violated the Fourth Amendment where, having issued a written warning to a driver who veered onto the shoulder of a highway and thus "got[ten] all the reasons for the stop out of the way," he extended the stop by seven or eight minutes to conduct a canine search, which was "not an ordinary incident of a traffic stop" and was "not fairly characterized as part of the officer's traffic mission" (alterations adopted) (internal quotation marks omitted)); *Boyce*, 351 F.3d at 1111 (concluding that a detention violated the Fourth Amendment when it "extended beyond the time necessary to process the traffic violation for which [the suspect] was stopped").

Because the existence of the affirmative defense of qualified immunity does not "clearly appear[] on the face of the complaint," the officers are not entitled to qualified immunity for extending the duration of Meshal's traffic stop, at least at this stage of the proceedings.[6] *See Fortner*, 983 F.2d at 1028 (internal quotation marks omitted).

---

[6] We note that although Meshal's complaint adequately alleged a violation of clearly established law, development of the factual record through discovery may bring to light new information that could affect the qualified immunity analysis. And the officers are free to reassert qualified immunity on a motion for summary judgment and at trial, if there is one, *See Behrens v. Pelletier*, 516 U.S. 299, 306 (1996); *Jackson v. City of Atlanta*, 97 F.4th 1343, 1355 n.5 (11th Cir. 2024); *Butler v. Smith*, 85 F.4th 1102, 1118 n.6 (11th Cir. 2023); *Cottrell v. Caldwell*, 85 F.3d 1480, 1487 (11th Cir. 1996).

**B.      The officers are not entitled to qualified immunity for searching Meshal's truck.**

Besides his seizure claim, Meshal also brought a claim for the unlawful search of his truck, based on his allegation that Frink, at the apparent invitation of Janufka, "opened the passenger side door of the semi-truck and physically lifted his dog into the cabin of the vehicle" before "enter[ing] the truck himself" for "approximately a minute and a half." Doc. 1 at 7–8. Based on the allegations in the complaint, the officers are not entitled to qualified immunity from this claim.

Generally, the Fourth Amendment requires officers to obtain a warrant supported by probable cause before searching a person's property. *United States v. Wilson*, 979 F.3d 889, 910 (11th Cir. 2020). Under the automobile exception to the Fourth Amendment, however, "officers may search an automobile without having obtained a warrant so long as they have probable cause to do so." *Collins v. Virginia*, 584 U.S. 586, 592 (2018). Probable cause to search a vehicle exists where an officer could conclude that "there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *United States v. Tamari*, 454 F.3d 1259, 1262 (11th Cir. 2006) (internal quotation marks omitted).

We have already explained that, under Meshal's version of events, the officers lacked arguable reasonable suspicion of a crime sufficient to detain Meshal longer than it would have taken to check his license and registration and write his traffic ticket. That necessarily means that they lacked arguable probable cause to search

Meshal's truck for contraband or evidence of a crime. *See United States v. Clark*, 32 F.4th 1080, 1087 n.1 (11th Cir. 2022) (recognizing that "reasonable suspicion . . . is a lower standard than probable cause"). Further, it was clearly established at the relevant time that arguable probable cause was required. *See United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011) ("For a warrantless search of an automobile to be constitutional . . . there must be probable cause to believe that it contains contraband or evidence of a crime."). Without arguable probable cause, the officers are not entitled to qualified immunity for searching Meshal's truck.

## IV.    CONCLUSION

For the above reasons, we affirm the district court's denial of qualified immunity.

**AFFIRMED.**