**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————

No. 23-13616

————————————

TAMMY WATKINS,

*Plaintiff-Appellee,*

*versus*

OFFICER LAWRENCE DAVIS,
OFFICER JOSHUA FAULKER,

    individually and in their official capacities as
    officers of the Henry County Police Department;

*Defendants-Appellants,*

HENRY COUNTY, GEORGIA,

    by way of Henry County Police Department, et al.,

*Defendants.*

————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:21-cv-04081-AT

————————————

Before ROSENBAUM, LAGOA, and WILSON, Circuit Judges.

ROSENBAUM, Circuit Judge:

An old saying observes that "the single biggest problem in communication is the illusion that it has taken place."  That was certainly the issue here.  And in this case, that problem resulted in a near-tragedy.

On a Saturday evening in the height of the pandemic, Tammy Watkins received a work call.  The hospital had just discharged a COVID patient.  He needed an oxygen concentrator, tanks, and supplies.  And she was supposed to supply it.

So Watkins drove to work to collect the equipment.  She worked at a business at the bottom of a hill, located off a cul de sac.  Because it was Saturday and the cul de sac housed businesses, no one else was around—including at Watkins's employer.  Watkins backed her car up to the building and loaded it.  When she was done, she got into her car, looked up the patient's address, and started to drive up the driveway.

As Watkins drove up the driveway, out of the dark, she suddenly saw two flashlights coming down the driveway towards her.  Alone in a desolate place, she feared for her safety.  She thought the people approaching her were about to attack her.  With only one way out of her workplace parking lot, Watkins accelerated up the driveway.

Then Watkins was sure her worst fears were being confirmed:  the people approaching started shooting at Watkins.  So Watkins ducked down in her car, somehow navigated the driveway, and turned to the right, away from the cul de sac.

To her great surprise, police cars were waiting there. Watkins immediately stopped her car. The officers yelled for her to get out. So Watkins did. Then the officers handcuffed her and put her in the back of a police cruiser, where she sat for three or four hours before the officers released her.

Watkins was lucky. Her car, which the officers shot four times and totaled, was the only physical casualty. The shots did not hit Watkins, and she was not physically harmed in any way.

Nor were the two people who approached Watkins. As it turned out, they were police officers—Officers Joshua Faulkner and Lawrence Davis. They were investigating a call about a possible truck break-in at a different address in the cul de sac. But as they descended upon Watkins, the officers never communicated that they were police. And in the darkness, Watkins could not see that they were.

Watkins sued under 42 U.S.C. § 1983. She alleged that the Officers violated her Fourth Amendment rights to be free from a "[s]eizure of [p]erson and [u]nlawful [d]etention," excessive force, and property damage to her car. The district court denied the officers summary judgment on qualified-immunity grounds on all three claims. They appeal that order.

After careful consideration and with the benefit of oral argument, we affirm the district court's order and remand for further proceedings consistent with this opinion.

# I. BACKGROUND
## A. *Factual Background*

At around 6:45 p.m. on January 16, 2021, Henry County law enforcement received a call that two people carrying flashlights were breaking into a black truck. The call reported that the truck was next to a yellow drilling rig at 11 Bellamy Place in Stockbridge, Georgia ("the dispatch location"). 11 Bellamy Place sits at the end of a cul-de-sac of commercial buildings.

About 8 minutes after the call, Officers Davis and Faulkner reached the dispatch location. Arriving after sundown, the pair found a pitch-black scene. No streetlights lit the road or cul-de-sac.

Officers Davis and Faulkner approached with their sirens and roof lights turned off, enveloped in the darkness. Then they parked about 50 yards up the road from the cul-de-sac. They planned to "sneak up on" any robbers.

After leaving their cars, the officers walked quietly to the dispatch location. They kept their flashlights off.

Officer Faulkner reported seeing movement "next to the yellow rig" parked at the front of 11 Bellamy Place. About a minute after sweeping the property, he also radioed that he heard voices inside the building.

Over the next few minutes, Officers Chresha Harris and Alan Yi each arrived separately. They too parked up the road from the cul-de-sac with their sirens and roof lights off and quietly approached 11 Bellamy Place. There, they met Officers Faulkner and

23-13616                Opinion of the Court                5

Davis near the front of the property, where Faulkner repeated his observations.

Suddenly, one of them whispered to turn off their flashlights. Officer Faulkner pointed at a "hatchback" at a different property across the cul-de-sac—30 Bellamy Place. As the district court explained, "[w]hen the cul-de-sac is viewed from above like a clock face," 11 Bellamy Place is located at the "one o'clock position" while 30 Bellamy Place is at the "eight o'clock position," directly left of the entry road. The two properties appear in the photo below, with 11 Bellamy Place labeled "Original Dispatch Location" and 30 Bellamy Place labeled "Suspicious Vehicle Location":



About a minute after pointing out the "hatchback," Officer Faulkner repeated that he had seen suspects at 11 Bellamy Place

"between this black truck and that yellow rig."  No one disputes that this "black truck" that matched the description from the 911 call was a separate car from the "hatchback" the officers saw across the cul-de-sac at 30 Bellamy Place.  At the time, Faulkner explained that he did not see where the suspects had gone.  But he later testified he speculated they jumped the fence behind 11 Bellamy Place.

Office Faulkner then returned his attention to the "hatchback."  And he asked, "Where's the hatchback at?"  Suddenly, something piqued his interest, and he exclaimed, "What do we got over there?"

In response, all four officers quickly moved towards 30 Bellamy Place, the only well-lit property in the cul-de-sac.  Officer Faulkner said he saw a lone woman close the hatchback and then get into the car.

Surveillance footage from 30 Bellamy Place shows that person was Tammy Watkins, a woman who was then 47 years old.  Once inside her car, the headlights went on.  For the next about thirty seconds, the building's surveillance video shows, Watkins sat there in the car.  Watkins later testified that she was looking up directions to a COVID-19 patient to deliver medical equipment.  And the surveillance footage confirms that she was looking at her phone while she sat in the car.

During this period, Officers Faulkner and Davis began to walk down the downward-sloping driveway towards 30 Bellamy Place and Watkins.  Officers Harris and Yi stayed behind.

Some dispute exists over how visible Officers Faulkner and Davis were in the driveway. On the one hand, a surveillance camera (which was apparently designed to work in the dark) shows brighter-than-natural footage, in which they are visible. The weather was clear, and Watkins's windshield was unobstructed.

But as we've mentioned, it was dark outside, and though the building at 30 Bellamy Place was well-lit, the long driveway approaching it had no lights. The officers were well camouflaged in black shoes, navy pants and jackets, and dark-colored hats. And Officer Davis also wore a black facemask and gloves. Plus, Watkins's headlights were directed across the driveway, away from the officers.

Officer Faulkner headed down the left side of the driveway while Officer Davis moved down the right. Near the top of the driveway, Officer Faulkner turned on his flashlight, mounted on top of the barrel of his gun, and pointed it at Watkins's car. Officer Davis kept his flashlight off.

Officer Faulkner's flashlight beam traveled up the parking-lot pavement onto the passenger side of Watkins's vehicle about 36 seconds after she got into her car. At just about the same time, Watkins put down her phone and put the car in drive. At this point, the district court noted, Watkins's car was about 78 to 110 feet from Officers Faulkner and Davis.

A second later, the hatchback rolled forward and quickly turned towards the gate leading from the parking lot to the start of the driveway. By now, Officers Faulkner and Davis were about

a quarter of the way down the driveway, and Davis took a few steps to the left into the center of the driveway. The record doesn't say why he did so, but the district court construed his actions to be "an apparent attempt to block the car's path." By contrast, Officer Faulkner moved towards the left edge of the driveway, away from the car's trajectory.

Three seconds after the car began moving, it reached the driveway gate, about 47 to 63 feet from the officers. Officer Davis stood silently in the right-center of the driveway, while Officer Faulkner exclaimed, "Uh-uh," and raised his gun at the car.

As the hatchback entered the driveway, Officer Davis turned on his flashlight, and Officer Faulkner yelled, "Freeze!" Almost immediately, Officer Davis dropped his flashlight, drew his gun, and swiftly moved back and to the left, across the driveway towards Officer Faulkner.

Within a second, Officer Faulkner once more screamed, "Hey, stop, freeze!" Then Officer Davis fired several shots into the front of Watkins's SUV. At the same time, security footage of the driveway captured Officer Davis moving away from Watkins's car to the left edge of the driveway. Still, it's not clear from either security or body-camera footage whether Officer Davis was ever in the path of Watkins's SUV.

When the car drew even with the officers, Officer Faulkner's body-camera footage shows, Faulkner fired at least one shot at the

23-13616                Opinion of the Court                9

front-right side of it.[1]  The entire time the car traveled in a straight path.  At no point did it swerve or otherwise change course as if to intentionally hit Officers Faulkner or Davis.  Watkins later testified that although she didn't hear anything until the gunshots, she accelerated up the driveway when she saw flashlights walking to her because she thought someone was trying to attack her.

While the car reached the end of the driveway, Officer Faulkner checked on Officer Davis, who fell into the grass behind him, next to the driveway.  Officer Faulkner found Officer Davis unharmed.  Then the two ran after the car, which had left the driveway.

When the car drove about 50 yards up the road, it stopped near the officers' parked cars.  Watkins's car never left the officers' sight line and stopped less than 15 seconds after the officers shot.

Officers Yi and Harris reached the SUV first.  They ordered Watkins to get out with her hands raised.  For their parts, as Officers Faulkner and Davis approached, they kept their guns drawn.  And Officer Davis also ordered Watkins to submit.  As Watkins backed away from her car, she yelled, "Wait, wait, I work there! I work there!"

---

[1] The parties dispute whether Officers Faulkner and Davis's firing complied with Henry County Police Department policy.  Official policy states that "shots will not be fired from or at moving vehicles, unless the occupants of the vehicle are using deadly force against the officer or another person, and it is the officer's reasonable belief there are no other alternative means of protecting life."

Upon learning this information, the officers began to reassure Watkins. Meanwhile, Officer Faulkner secured her and confirmed that she was alone and not injured. Watkins explained that, as assistant manager of the business at 30 Bellamy Place, she was picking up oxygen tanks and equipment to deliver to a COVID patient. She told the officers, "I didn't know who y'all was—I was scared because I was down there by myself." Officer Faulkner replied, "That's understandable."

Later, Officer Harris echoed that sentiment. She testified that she didn't believe Watkins could tell that officers were approaching her when she fled. And she didn't think Watkins intended to aim her car at Officers Faulkner and Davis.

Back at the scene, Officer Yi led Watkins away from her car. Then Officers Faulkner and Davis began inspecting it. The SUV had one bullet hole in the windshield, two in the hood, and one in the front passenger-side door. Officer Davis told Faulkner, "I thought she was going to fucking hit me." And Davis replied, "Yeah, I did too. She was trying to."

Officer Yi returned to check on Officers Faulkner and Davis. Officer Davis explained, "We were just going to talk to her because she was out there.'"

Ultimately, Officer Yi separated Officers Faulkner and Davis from the investigation about three-and-a-half minutes after Watkins got out of her car and about four minutes after they fired shots.

Meanwhile, Officer Harris secured Watkins in the back of her cruiser. The officers kept Watkins there, handcuffed, for three

to four hours before releasing her.  At some point, an ambulance arrived at the scene.  Medical personnel evaluated Watkins on site and determined she didn't have any physical injuries.  After the officers released Watkins, her mother and sister took her home.

The police never charged Watkins with any crime.  But that evening, the Georgia Bureau of Investigation took custody of Watkins's car.  Later, Watkins's insurance company declared the SUV a total loss because of the gunshot damage.

### B.  Procedural Background

Watkins sued Officers Faulkner and Davis ("Defendants" or "Officers") under 42 U.S.C. § 1983.  She alleged they had subjected her to a "[s]eizure of [p]erson and [u]nlawful [d]etention," excessive force, and property damage in violation of the Fourth Amendment.[2]  She also raised some state-law claims.  The Officers jointly moved for summary judgment.

The district court granted their motion on Watkins's state-law claims.  It concluded that the Officers were entitled to official immunity under Georgia's constitution.

But the court denied the Officers' motion on Watkins's § 1983 claims.  The court determined that the officers had seized Watkins's person because "Watkins stopped and submitted to police authority shortly after, and because, the shots were fired."  As

---

[2] Watkins also initially sued Henry County and Chief of Police Mark Amerman but later abandoned her claims against them.

for Watkins's "seizure of person and unlawful detention" claim, the district court construed it as an "unlawful investigatory stop" claim. And the court held that the officers were not entitled to qualified immunity on that claim. The court explained that "a reasonable jury could conclude that Defendants did not have arguable reasonable suspicion that Watkins was involved in criminal activity when they seized her."

As to the excessive-force claim, the court held that "a reasonable jury could conclude that Defendants lacked probable cause to believe that [Watkins] was using her car as a dangerous weapon." So, the court reasoned, "firing on Watkins violated her clearly established rights to be free from excessive force."

Finally, on Watkins's property claim, the court also denied qualified immunity. It held that "a reasonable police officer would have known that exigent circumstances did not permit the warrantless seizure of Watkins's car, and that effecting such a seizure would violate clearly established law."

Officers Faulkner and Davis now appeal the denial of their motion for summary judgment on all three of Watkins's § 1983 claims.

## II. STANDARD OF REVIEW

We review de novo a district court's denial of a motion for summary judgment on qualified-immunity grounds. *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011). Summary judgment is appropriate only when the moving party shows that no disputed issue of material fact exists. *Gervin v. Florence*, 139 F.4th 1236, 1245

23-13616            Opinion of the Court              13

(11th Cir. 2025). On a motion for summary judgment based on qualified immunity, we "resolve all issues of material fact in favor of the [P]laintiff, and then determine the legal question of whether the defendant is entitled to qualified immunity under that version of the facts." *Bashir v. Rockdale County*, 445 F.3d 1323, 1326–27 (11th Cir. 2006). We don't make credibility determinations or choose between conflicting testimony. *Bozeman v. Orum*, 422 F.3d 1265, 1267–68 (11th Cir. 2005) (per curiam).

## III. DISCUSSION

Watkins alleges three violations of her Fourth Amendment rights: a "seizure of person and unlawful detention," the use of excessive force, and an unlawful seizure of her property. The Officers argue that they are entitled to qualified immunity on all three of Watkins's claims because they say (1) they never seized her or her vehicle, (2) they did not violate the Fourth Amendment, and (3) they did not violate clearly established law.

We begin by quickly reviewing the principles of qualified immunity.

To invoke qualified immunity, an official must first show that he "was acting within the scope of his discretionary authority" when he engaged in the challenged acts. *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018). Watkins concedes that the Officers did that. As a result, the burden shifts to Watkins to show that the Officers aren't entitled to qualified immunity. *Id.*

To do that, Watkins must establish "both that the [O]fficer[s'] conduct violated a constitutionally protected right and

that the right was clearly established at the time of the misconduct." *Id.* Whether a right is "clearly established" raises an objective question. *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000). And "a police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and the information possessed by the officer at the time the conduct occurred." *Id.*

Watkins can show the law was "clearly established" in any of three ways: (1) she can identify a qualifying case with "indistinguishable facts," (2) she can rely on "a broad statement of principle within the Constitution, statute, or case law," or (3) she can show that the Officers' behavior was "so egregious" that it was obvious "a constitutional right was clearly violated, even in the total absence of case law." *Gervin*, 139 F.4th at 1261. The caselaw she can cite to support this showing includes the "binding decisions of the Supreme Court of the United States, this Court, and the highest court of" Georgia. *Glasscox v. City of Argo*, 903 F.3d 1207, 1217 (11th Cir. 2018). But we can also "consider persuasive out-of-circuit authority to determine whether a violation was of 'obvious clarity.'" *Gilmore v. Ga. Dep't of Corr.*, 144 F.4th 1246, 1259 (11th Cir. 2025) (en banc).

We analyze each Defendant's actions and omissions separately when we consider whether Watkins carried her burden to show that qualified immunity is not appropriate. *Alcocer*, 906 F.3d at 951.

23-13616               Opinion of the Court                    15

Watkins alleges Officers Faulkner and Davis violated the Fourth Amendment.  As relevant here, that amendment guarantees that "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable . . . seizures, shall not be violated . . . ."  U.S. CONST. amend. IV.  "The touchstone of the Fourth Amendment is reasonableness."  *Barnes v. Felix*, 145 S. Ct. 1353, 1358 (2025) (internal quotation marks and citation omitted).

Being a police officer is a hard job, and we are indebted to officers who regularly put their lives on the line to keep us safe. That said, officers have a responsibility to exercise their authority—especially when it's obvious it could cause injury or death to civilians—reasonably and with common sense.  When we view the evidence in the light most favorable to Watkins, we must conclude that a genuine question of fact exists here as to whether the Officers did that.

Officers Faulkner and Davis were assigned to respond to a report of two individuals breaking into a truck at 11 Bellamy Place. Yet they went to 30 Bellamy Place, where they saw a lone woman and a hatchback car (not a truck).  They had no grounds to suspect her of any wrongdoing.

Still, in darkness and effectively camouflaged, they approached her without identifying themselves.  Then they demanded that she, a woman driving alone on an isolated driveway, with only one way out, immediately stop for them.  And when she tried to escape from what a reasonable person would have thought

was a dangerous situation, without any warning, they repeatedly fired their weapons at her.

As we explain below, a reasonable jury could conclude that no reasonable officer would have thought Watkins a threat, that no reasonable officer would have shot at her, and that no reasonable officer would have acted as Officers Faulkner and Davis did. So we affirm the denial of summary judgment on qualified-immunity grounds on all three of Watkins's claims. We address each claim individually in turn.

### A.  Officers Faulkner and Davis seized Watkins's person.

Before we consider Watkins's "seizure of person and unlawful detention" and excessive-force claims, we must first assess whether Officers Faulkner and Davis seized Watkins's person. That's so because, as relevant here, the Fourth Amendment's protections kick in when an officer engages in a "seizure of the person." *See California v. Hodari D.*, 499 U.S. 621, 625 (1991).

An officer may effect a "seizure of the person" in one of two ways. He may either use physical force, or even with no force, he may seize a person by securing the person's "submission to the assertion of authority." *Id.* at 626 (emphasis altered). "[E]ach type of seizure enjoys a separate common law pedigree that gives rise to a separate rule." *Torres v. Madrid*, 592 U.S. 306, 322 (2021).

The Officers argue they never seized Watkins. Instead, they say, they "fired in self-defense not in an effort to detain [Watkins]" and "did not hit [Watkins]." Plus, they argue, "[Watkins] did not stop due to gunfire."

But we disagree with the Officers' assessment.  Under both the physical-force and the submission-of-authority tests, Officers Faulkner and Davis seized Watkins.

1.    Physical Force

We first consider whether the Officers used physical force to seize Watkins.  Everyone agrees on the basic facts that constrain our analysis.  Together, the Officers intentionally shot Watkins's car four times as she was driving it.  Officer Davis hit the car three times, and Officer Faulkner hit the car once.  But no bullet pierced Watkins's flesh.  So we must determine whether intentionally firing at and hitting Watkins's car constituted a seizure of Watkins as the car's driver.

We hold that it did.  We begin with *Torres v. Madrid*, 592 U.S. 306.  In *Torres*, the Court considered what it means to seize a person using physical force.  *See id.*  Similarly to the facts here, in *Torres*, officers fired their guns at Roxanne Torres as she drove her car away from them, mistakenly thinking they were carjackers.  *Id.* at 309–10.  But unlike here, two of the officers' thirteen shots hit Torres's back.  *Id.* at 310.  She sought damages under 42 U.S.C. § 1983.  *Id.*

To determine whether the officers seized Torres, the Supreme Court "consult[ed] the common law of arrest, the 'quintessential "seizure of the person" under our Fourth Amendment jurisprudence.'"  *Id.* at 311 (quoting *Hodari D.*, 499 U.S. at 624).  Noting that law enforcement didn't carry firearms until the second half of the nineteenth century, the Court looked in the common law for

18                    Opinion of the Court                    23-13616

an analogy to the use of a bullet to seize a person. *See id.* at 315–16.

And it found one. In *Countess of Rutland's Case* (1605), Co. Rep. 52b, 77 Eng. Rep. 332, serjeants-at-mace had to execute a writ for a judgment of debt against the Countess of Rutland. *Torres*, 592 U.S. at 315. To do so, they "shewed her their mace, and touching her body with it, said to her, we arrest you, madam." *Id.* (quoting *Countess of Rutland's Case*, 6 Co. Rep. at 54a, 77 Eng. Rep. at 336).

The Court understood *Countess* "as an example of an arrest [or seizure] made by touching with an object . . . ." *Id.* And it found "no basis for drawing an artificial line between grasping with a hand and other means of applying physical force to effect an arrest [seizure]." *Id.* at 316. So, the Court reasoned, "[t]he required 'corporal seising or touching the defendant's body' can be as readily accomplished by a bullet as by the end of a finger." *Id.* (quoting 3 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 228 (1768)). Indeed, the Court explained, "[w]e will not carve out this greater intrusion on personal security from the mere-touch rule just because founding-era courts did not confront apprehension by firearm." *Id.*

Still, the Court cautioned, not every physical contact between law enforcement and a member of the public amounts to a Fourth Amendment seizure. *Id.* at 317. Rather, two things are necessary for a Fourth Amendment seizure: (1) "the use of force *with* [(2)] *intent to restrain*." *Id.* Indeed, the combination of these two

things effects a seizure even when it does not manage to restrain the person. *Id*. at 313.

We consider each requirement.

First, "the use of force": *Torres* and *Countess* teach that "a mere touch" can be enough "force" to effect a seizure. *See Torres*, 592 U.S. at 317. And that "mere touch" may be indirect—through an object like a mace or a bullet. *See id*. at 316.

But that's not all. *Torres* finds more guidance in an analogy to common-law torts, specifically the tort of false imprisonment, to conclude "that the common law considered touching to be a seizure." *Id*. at 320; *cf. United States v. Jones*, 565 U.S. 400, 406 (2012) ("[F]or most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas" including "persons" that "it enumerates."). As the Court explained, "false imprisonment required 'confinement' . . . ." *Torres*, 592 U.S. at 320. But "confinement," in turn, consisted of "no more than that the defendant 'had for one moment taken possession of the plaintiff's person'—including, 'for example, if he had tapped her on the shoulder, and said, "You are my prisoner."'" *Id*.

So we follow the Supreme Court's lead and look to the common law for guidance on the meaning of "touch" and "force" more generally. *See id*. at 314 (looking to the common-law meaning of "force" and noting that "'[t]he least touching of another's person' could satisfy the common law definition of force to commit battery, 'for the law cannot draw the line between different degrees of

violence'" (alteration in original) (quoting BLACKSTONE, COMMENTARIES, *supra*, at 120); *cf. Jones*, 565 U.S. at 405–08 ("[O]ur Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century," and looking to common-law trespass for guidance in determining whether the use of a GPS tracking device was a search under the Fourth Amendment). The common law had much to say about the concept of "touch." Indeed, common-law "touch" extended beyond just person-to-person contact.

For example, the common law defined the "crime of battery" as the "intentional application of unlawful force against the person of another" with force "satisfied by even the slightest offensive touching." *Johnson v. United States*, 559 U.S. 133, 139 (2010) (citing BLACKSTONE, COMMENTARIES, *supra*, at 120); *cf. Torres*, 592 U.S. at 314 (looking to the definition of "force" for battery actions to discern the "force" necessary to sustain an arrest). And that touching extended to "anything attached to the person" that through its attachment "partakes of [a person's] inviolability." *Respublica v. De Longchamps*, 1 U.S. (1 Dall) 111, 114 (O.T. Phila. 1784). So "[t]hough no great bodily pain is suffered by a blow on the palm of the hand, or the skirt of the coat, . . . these are clearly within the legal d[e]finition of Assault and Battery . . . ." *Johnson*, 559 U.S. at 146 (Alito, J., dissenting) (internal quotation marks omitted) (second alteration in original) (quoting *Respublica*, 1 U.S. at 114).

But the concept of "touch" did not end with a person's clothing. Rather, as early as the seventeenth through nineteenth

centuries, courts and scholars evaluating assault-and-battery claims recognized that hitting a horse amounted to a strike upon its rider. *See*, *e.g.*, *Dodwell v. Burford* (1669), 86 Eng. Rep. 703, 703; 1 Mod. 25, 25 ("The plaintiffs, in an action of battery declared, that the defendant struck the horse whereon the wife rode, so that the horse ran away with her, whereby she was thrown down, and another horse ran over her . . . ."); *Bannister v. Fisher* (1808), 127 Eng. Rep. 872, 872; 1 Taunt. 358, 358 ("The Defendant could not assault the horse while the man was on it, without assaulting the man."); *State v. Davis*, 19 S.C.L. (1 Hill) 46, 47 (1833) ("It has been held that . . . striking violently . . . the horse on which [a person] rides, is an assault; The thing in th[is] instance[] partaking of the personal inviolability."); ISAAC ESPINASSE, DIGEST OF THE LAW OF ACTIONS AND TRIALS AT NISI PRIUS 174 (3d ed. 1811) ("[I]f any person had whipped [a] horse, and made him runaway with the rider, and hurt . . . the rider himself, he would be liable who had whipped the horse." (emphasis omitted)); ARCHIBALD JOHN STEPHENS, LAW OF NISI PRIUS, EVIDENCE IN CIVIL ACTIONS, AND ARBITRATION & AWARDS 210–11 (1842) (recognizing a battery "where the plaintiff declared that the defendant struck the horse whereon his wife rode, so that the horse ran away with her, whereby she was thrown down, and another horse ran over her"); FRANCIS WHARTON, TREATISE ON CRIMINAL LAW § 617 (9th ed. 1885) ("A battery is an assault in which force is applied, by material agencies, to the person of another, either mediately or immediately . . . . The force may be applied through conductors more or less close. Thus to strike . . . the horse on which he is riding . . . may be as much a battery as to strike his face . . . .");

*cf. Storey v. Robinson* (1795), 101 Eng. Rep. 476, 479; 6 T.R. 138, 139 (holding that it is illegal to distrain a horse with a rider on it).

And that was so whether the victim rode on the horse's back or inside a carriage that the horse pulled. *Marentille v. Oliver*, 2 N.J.L. 379, 380 (1808) (opinion of Pennington, J.) ("To attack and strike with a club, with violence, the horse before a carriage, in which a person is riding, strikes me as an assault on the person . . . ."); ESPINASSE, DIGEST, *supra*, at 173 ("Striking any thing attached to a person, . . . if intended as a rudeness and affront, is a battery. So striking . . . horses before a carriage in which a person was riding, was held to be an assault upon the person. In [that] case[] the subject partaking of the personal inviolability."); HENRY G. COTTON, TREATISE ON THE POWERS AND DUTIES OF THE PEACE IN THE STATE OF ILLINOIS 220 (1845) ("Striking violently, with a club, horses before a carriage in which a person was riding, was held to be an assault upon the person.").

Similarly, courts held, and scholars recognized, that contact with a cart or wagon could support a claim of assault on a rider. *See, e.g.*, *Hopper v. Reeve* (1817), 129 Eng. Rep. 278, 278; 7 Taunt. 699, 699 ("It is a direct trespass to injure the person of another by driving a carriage against the carriage wherein such person is sitting . . . ."); *People v. Lee*, 1 Wheeler Crim. Cas. 364, 365 (N.Y. Crim. Ct. 1823) ("[T]he conduct of the defendant, in attempting to run against the wagon of the prosecutor, was clearly an assault; his horse and cart was merely a machine, and could as well be directed against the prosecutor as any other inanimate object."); ARCHIBALD JOHN

23-13616                 Opinion of the Court                        23

STEPHENS, LAW OF NISI PRIUS, *supra*, at 208 ("[U]psetting a carriage or chair in which a person is sitting, is a trespass against the person . . . ."); HENRY G. COTTON, TREATISE ON THE POWERS AND DUTIES, *supra*, at 220 ("It is an assault to attempt to run against the wagon of another person on the highway. The horse and cart of the defendant being merely a machine, could as well be directed against the prosecutor as an inanimate object.").

Put simply, then, at common law, touching a person's horse or carriage—directly or indirectly—while the person rode amounted to touching their person. So under *Torres*'s rule, touching a rider's horse or carriage committed the necessary "force" to effect a seizure because the common law understood the touch as a touch of the person. *See Torres*, 592 U.S. at 313–18, 325.

We see no material difference from an officer's bullet that strikes the car of a person driving it. Of course, we don't see many horse-drawn carriages anymore. But that's so because cars took their place. So if touching a carriage or the horse drawing it counted as the "force" necessary to effect a seizure of the rider inside the carriage, then touching a car with a driver inside it also amounts to the "force" necessary to effect a seizure of the driver. And because *Torres* teaches that touching with a bullet is the same thing as touching with a hand, the Officers' shots that hit Watkins's car were the necessary "force" to satisfy the first requirement of effecting a seizure under the Fourth Amendment.

That brings us to the second requirement for a seizure: "intent to restrain." *Torres*, 592 U.S. at 317 (emphasis altered). We

assess whether the Officers intended to restrain by asking "whether the challenged conduct *objectively* manifests an intent to restrain." *Id.* In conducting our analysis, we don't consider "the subjective perceptions of the seized person." *Id.*

Once again, we look to *Torres* for guidance. There, the Court concluded that shooting at Torres's car "objectively manifested an intent to restrain her from driving away." *Id.* at 318. We discern no basis for distinguishing Officers Faulkner and Davis's shooting of Watkins's car. So we conclude that the officers "inten[ded] to restrain" Watkins when they shot her car.

Because Officers Faulkner and Davis both used force to indirectly touch Watkins when they shot the car she was driving and they intended to restrain her at that time, they effected a seizure by physical force of Watkins under the Fourth Amendment.

We know some of our sister circuits have concluded that shooting a car to restrain the driver does not effect a seizure by physical force.[3] But the courts decided each of these cases without

---

[3] *See Bella v. Chamberlain*, 24 F.3d 1251, 1255–56 (10th Cir. 1994); *Cole v. Bone*, 993 F.2d 1328, 1332–33 (8th Cir. 1993); *Adams v. City of Auburn Hills*, 336 F.3d 515, 519 (6th Cir. 2003). By contrast, the Fifth Circuit has held that in a case like this one, where an officer shot a car, damaged it, and caused the driver to exit to investigate the noise, the officer committed a seizure by physical force. *Flores v. City of Palacios*, 381 F.3d 391, 396–97 (5th Cir. 2004); *cf. Schultz v. Braga*, 455 F.3d 470, 483 (4th Cir. 2006) (refusing to follow *Flores* where a shot did not intentionally terminate the freedom of movement of a passenger plaintiff but declining to rule on whether "a suspect must be physically struck by a bullet (or any other object) to state a claim for excessive force").

23-13616            Opinion of the Court                25

the benefit of *Torres*'s guidance.[4]  And now that we have that, *Torres* causes us to conclude that shooting a car to restrain the driver does effect a seizure.

*Troupe v. Sarasota County*, 419 F.3d 1160 (11th Cir. 2005), does not require a different answer.  There, an officer attempted to "disable [a] car" by firing "a single shot at a low angle, aiming for the lower portion of the tire."  *Id.* at 1164 (internal quotation marks omitted).  But the officer "missed the tire and, apparently, did not strike anyone or anything."  *Id.*  So we found no seizure.  *Id.* at 1167.  Though we decided *Troupe* years before the Supreme Court issued *Torres*, our answer makes sense even under *Torres* because no touch occurred when the bullet missed, so no "force" took place, as the common law understood that concept.[5]

---

[4] We similarly concluded in an unpublished opinion four years before the Supreme Court issued *Torres* that shooting and hitting a car does not seize the driver.  *See Reed v. Clough*, 694 F. App'x 716, 724 (11th Cir. 2017) (per curiam) (unpublished).  But unpublished opinions are "not binding authority and . . . [are] persuasive only to the extent that a subsequent panel finds the rationale expressed in that opinion to be persuasive after an independent consideration of the legal issue."  *United States v. Doe*, 137 F.4th 1277, 1283 (11th Cir. 2025) (internal quotation marks and citation omitted).  Because *Torres* requires a different analysis and answer than *Reed*, we don't find *Reed* persuasive, so we do not follow it.

[5] *Troupe* did hold that "stopping a vehicle's driver does not constitute a seizure of a passenger."  419 F.3d at 1167.  There, a separate officer "fired two shots at the driver"; "[o]ne bullet struck the driver's door just above the keyhole" and "[t]he other bullet went through the driver's side window and hit [the driver] in the back."  *See id.* at 1164.  *Troupe* found no seizure of the passengers.  *Id.* at 1167.  But the opinion did not address whether the *driver*, who was seized

26                     Opinion of the Court                   23-13616

In sum, we hold that Officers Faulkner and Davis seized Watkins by physical force when they shot and hit her vehicle.

2.  Show of Authority

Besides seizing Watkins by physical force, the Officers simultaneously seized her by a show of authority. The district court correctly deployed this framework in this exceptional case to hold that the Officers seized Watkins.

A seizure based on a show of authority occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower v. County of Inyo*, 489 U.S 593, 597 (1989); *see also Tennessee v. Garner*, 471 U.S. 1, 7 (1985) ("Whenever an officer restrains the freedom of a person to walk away, he has seized that person.") "In determining whether the means that terminates the freedom of movement is the very means that the government intended we cannot draw too fine a line . . . ." *Brower*, 489 U.S. at 598. It is "enough for a seizure that a person be

---

when his body was hit, would have been seized had the officer hit only the car. And shooting at and hitting a car (but not the driver) effects a seizure of the driver but not the passenger because in the case of the driver, it satisfies both parts of the definition of "seizure"—(1) force and (2) intent to restrain—but in the case of the passenger, it satisfies only the first prong. Drivers steer vehicles; passengers don't. So shooting a moving car objectively evidences an intent to restrain the *driver*, who controls the car. That same intent is not necessarily present to restrain the movement of a passenger, who sits passively in the hands of the driver and who the police may not even realize is in the vehicle.

23-13616                    Opinion of the Court                    27

stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* at 599.

For this kind of seizure, "[a] person has been seized . . . only if, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *Hodari D.*, 499 U.S. at 627–28 (quoting *United States v. Mendenhall*, 446 U.S. 544, 554 (1980) (opinion of Stewart, J.)) (internal quotation marks omitted). "[T]he test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person." *Id.* at 628.

In a canonical opinion, which the full Court has since embraced, Justice Stewart offered examples of facts "that might indicate a seizure." *Mendenhall*, 446 U.S. at 554 (opinion of Stewart, J.); *see also Hodari D.*, 499 U.S. at 627 *(recognizing Justice Stewart's "Mendenhall test" was "adopted by the Court in later cases").* For instance, he pointed to "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Mendenhall*, 446 U.S. at 554 (opinion of Stewart, J.); *see also United States v. Jordan*, 635 F.3d 1181, 1186 (11th Cir. 2011) (quoting *United States v. Perez*, 443 F.3d 772, 778 (11th Cir. 2006)) (to determine "whether a seizure has occurred, we consider . . . 'whether a citizen's path is blocked or impeded; whether identification is

retained; the suspect's age, education and intelligence; the length of the suspect's detention and questioning; the number of police officers present; the display of weapons; any physical touching of the suspect, and the language and tone of voice of the police'").

Our sister circuits have recognized that one kind of show-of-authority seizure occurs when an officer fires his weapon, and the suspect stops and submits to police custody as a result. *See, e.g.*, *Floyd* v. *City of Detroit*, 518 F.3d 398, 406 (6th Cir. 2008) (finding a seizure when an officer's "firing his weapon at [the suspect] was a show of authority that actually had the intended effect of contributing to [the suspect]'s immediate restraint."); *Flores v. City of Palacios*, 381 F.3d 391, 396–97 (5th Cir. 2004) (holding that a seizure occurred when an officer shot a suspect's vehicle, and the suspect stopped and exited the vehicle to investigate the noise); *Bella v. Chamberlain*, 24 F.3d 1251, 1255 (10th Cir. 1994) ("[W]hen law enforcement officers shoot at a fleeing suspect, a 'seizure' occurs only if the shot strikes the fleeing person or if the shot causes the fleeing person to submit to this show of authority."). After all, nothing can communicate more clearly to a suspect that she is not free to leave than the barrel of a fired weapon. *Cf. Mendenhall*, 446 U.S. at 554 (opinion of Stewart, J.); *Jordan*, 635 F.3d at 1186.

Here, Officers Faulkner and Davis shot at Watkins. So upon realizing that they were police officers, no reasonable person would have felt free to leave. The Officers also intended to seize Watkins when they fired at her. Indeed, Officer Faulkner expressly directed Watkins to submit when he yelled, "Freeze! . . . Hey, stop, freeze!"

23-13616                  Opinion of the Court                  29

For these reasons, the Officers' conduct satisfied this part of the show-of-authority test. That is, the Officers obviously made a show of authority.

But the analysis does not end there. Unlike with a seizure by physical force, a seizure by a show of authority doesn't happen unless the subject *yields*. *Hodari D.*, 499 U.S. at 626. In other words, "[w]hen a suspect flees from the police, he is not submitting to their authority and therefore is not seized." *Jordan*, 635 F.3d at 1186. As a result, for a show-of-authority seizure to occur, ordinarily a suspect must submit immediately upon that showing to demonstrate he yields. *Cf. Hodari D.*, 499 U.S. at 626 (The concept of a seizure "does not remotely apply . . . to the prospect of a policeman yelling 'Stop, in the name of the law!' at a fleeing form that continues to flee.")

Watkins didn't stop immediately upon the Officers' shooting. And in almost all cases that would signal she didn't submit to the show of authority. *Cf. id.* But this is a very unusual case. Based on the unique record before us, we conclude she did in fact submit to comply with the Officers' intended seizure.

The key point is that Watkins didn't—and under the novel circumstances here, couldn't—understand a show of authority occurred until she saw patrol cars and learned that Officers Faulkner and Davis were officers. They approached her camouflaged in dark clothing under cover of darkness and oddly never identified themselves before they shot at her. But when it became apparent that the Officers were officers—once Watkins saw their patrol vehicles

less than fifteen seconds after the Officers fired at her and while she remained in their eyesight—she immediately stopped to submit. At no point, the record makes clear, did Watkins ignore a known show of authority and refuse to submit. Rather, Watkins submitted in direct response to both Officers' shooting.

In short, the shooting caused Watkins's submission. And Watkins was "stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Brower*, 489 U.S. at 599.

We can contrast Watkins's unusual case with that of the defendant in *Hodari D.* In *Hodari D.*, an officer chased a defendant, but the defendant ignored the clearly identified officer's show of authority. *See Hodari D.*, 499 U.S. at 623. Instead, "looking behind as he ran" and seeing an officer, the defendant "tossed away . . . a small rock" that turned out to be crack cocaine. *Id.* In other words, recognizing that law enforcement was after him, the *Hodari D.* defendant tried to discard incriminating evidence. *Id.* The Supreme Court concluded the defendant had not been seized at the time he threw away the drugs because at that point he had not yielded to the submission of authority. *Id.* at 626.

Unlike Watkins, the *Hodari D.* defendant immediately recognized that officers were subjecting him to a show of authority. But he never yielded. *See id.* at 623. Rather, the officer had to tackle the defendant to stop him. *See id.* And the *Hodari D.* defendant's effort to rid himself of the incriminating evidence proved that he recognized the show of authority, even though he did not yield.

In contrast, the record here reflects that the Officers were camouflaged in dark clothing in a desolate and unlit area and they never announced that they were officers, even when they started firing at Watkins. As a result, importantly, Watkins both had no reason to and did not recognize the Officers were police. So she was unaware that they had engaged in a show of authority until she saw the police cars once she left the cul de sac. Nor at any point did Watkins throw away illegal material or otherwise indicate she recognized the Officers were police and made a choice to ignore their commands. Had she done so, she, like the *Hodari D.* defendant would have proven by her conduct that she did recognize the Officers were police. Or if the Officers had simply announced that they were police, then we could conclude she should have recognized that they were Officers. But neither of those things happened. Instead, at the first opportunity Watkins reasonably had to submit to the show of force—when she realized the Officers were law enforcement upon seeing the police cars—she immediately submitted.

To be sure, in *Torres*, the Supreme Court cautioned that a seizure is "a single act, and not a continuous fact." *Torres*, 592 U.S. at 323 (quoting *Hodari D.*, 499 U.S. at 625). And it declined to adopt a distinction for *physical-force seizures* when a seizure occurs after a gunshot wound if the suspect "stop[s] 'maybe 50 feet' or 'half a block' from the scene of the shooting to allow the officers to promptly acquire control." *Id*. But in that case, the officers' shots did not bring the suspect down immediately, and unlike here, the suspect never recognized the officers were police, so she never

chose to submit to the officers' authority. Indeed, in contrast to Watkins's case, the *Torres* suspect reasonably should have understood she was dealing with law enforcement. But she was experiencing methamphetamine withdrawal during her interaction with police, so she didn't notice that they were wearing tactical vests marked with police identification.

And as we've noted, in *Torres*, the Court also explained that a show-of-authority seizure "requires that 'a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result.'" *Id.* (quoting *Brower*, 489 U.S. at 599). That's what happened here. A "single act"—the shooting—seized Watkins in fact. Watkins stopped solely and voluntarily because of the show of authority that the shooting represented; the Officers made no other shows of authority before she stopped. And she stopped immediately upon realizing the Officers were police and had made a show of authority—when she saw the police cars in the cul de sac. Not only that, but on this record, Watkins's failure to recognize that the Officers were police and had engaged in a show of authority until she saw the police cars after leaving the cul de sac was reasonable. So at no point did Watkins choose to refuse police officers' commands. Rather, she obeyed them as soon as she reasonably realized the Officers had engaged in a show of authority. We therefore conclude, based on this extraordinary record, that a show-of-authority seizure occurred.

In sum, under both the physical-force and show-of-authority tests for a seizure, Officers Faulkner and Davis seized Watkins. As a result, the protections of the Fourth Amendment kicked in.

### B. The Officers are not entitled to qualified immunity on Watkins's "seizure of person and unlawful detention" claim.

Having established that the Officers seized Watkins, we turn to her "unlawful detention" claim. In her barebones complaint, Watkins labels her claim as being for "[s]eizure of [p]erson and [u]nlawful [d]etention." The district court construed Watkins's argument to be "(1) that Defendants unlawfully seized her to conduct an investigative stop and (2) that the stop matured into an unlawful arrest during the several hours that she was detained." Because Defendants were "separated from the investigation less than four minutes after Watkins was seized" and were "present for [only] the initial stop, questioning, and securing of Watkins," the district court concluded that they could be liable for only the "investigative stop." As a result, both parties focus their argument on whether the Officers conducted a lawful investigatory stop of Watkins.

But we conclude that Defendants didn't conduct just an investigatory stop. Rather, they arrested Watkins.

*Terry v. Ohio*, 392 U.S. 1 (1968), governs our inquiry into whether a suspect experienced only an investigatory stop or rather, an arrest. Under *Terry*, we must evaluate "whether the stop went too far and matured into arrest before there was probable cause . . . ." *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). We employ "four non-exclusive factors" to "more

objectively draw[] the line between a *Terry* stop and an arrest in an individual case . . . ." *Id.* at 1146. Those factors include (1) "the law enforcement purposes served by the detention," (2) "the diligence with which the police pursue the investigation," (3) "the scope and intrusiveness of the detention," and (4) "the duration of the detention." *Id.* (quoting *United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir. 2000)(per curiam)).

Here, the Officers interacted with Watkins for no more than four minutes. But Watkins's full detention lasted several hours, beginning with her interaction with the Officers. And it's hard to imagine a more intrusive detention than one that began with a shooting. After all, the Supreme Court has explained that "[t]he intrusiveness of a seizure by means of deadly force is unmatched." *Garner*, 471 U.S. at 9.

Of course, we have recognized that when it comes to *Terry* stops, "officers may take reasonable steps to ensure their safety so long as they possess 'an articulable and objectively reasonable belief that the suspect is potentially dangerous.'" *Acosta*, 363 F.3d at 1146 (quoting *Michigan v. Long*, 463 U.S. 1032, 1051 (1983)). So, for instance, we've held that an officer drawing a weapon "does not necessarily convert an investigatory stop into an arrest." *United States v. Roper*, 702 F.2d 984, 987 (11th Cir. 1983). But we have never suggested that an officer may discharge their weapon and still be engaged in simply an investigatory stop.

Nor could we. After all, to evaluate whether the use of deadly force is lawful, we assess whether the officer "has probable

cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others . . . ." *Garner*, 471 U.S. at 11. That is, to inflict deadly force, an officer must have at least "probable cause" that the suspect has engaged in a crime—the same standard for an arrest. *See id.*; *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007) ("[A]n officer who arrests an individual without probable cause violates the Fourth Amendment."). But an officer need have only "reasonable suspicion . . . [,] a less demanding standard than probable cause . . . ," to justify a *Terry* stop. *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). So it would be odd to suggest a stop that involved a shooting by an officer could be supported just by reasonable suspicion.

As for the purpose of the stop here, we see nothing investigatory about it. A *Terry* stop must be "justified at its inception . . . ." *Terry*, 392 U.S. at 20. But the Officers' first contact with Watkins occurred when Officer Faulkner yelled "Freeze! . . . Hey, stop, freeze!" and both Officers began firing. They now claim self-defense, not a need to have investigated Watkins for a crime. That is, the Officers responded with deadly force to what they said they thought was a threat to their lives.

So we conclude Officers Faulkner and Davis arrested Watkins, and their actions had to be supported by probable cause.

Still, we acknowledge that the parties focus their arguments on whether the Officers had "reasonable suspicion" to support stopping Watkins in the first place. And the parties dispute

whether the Officers were entitled to qualified immunity on that basis. So we also address those arguments.

Construing the facts for Watkins, we conclude no reasonable officer could think Defendants even had reasonable suspicion. Because "reasonable suspicion is a less demanding standard than probable cause . . . ," *Wardlow*, 528 U.S. at 123, no reasonable officer would think they had probable cause, either.

"[R]easonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause." *Kansas v. Glover*, 589 U.S. 376, 380 (2020) (quoting *Alabama v. White*, 496 U.S. 325, 330 (1990)) (internal quotation marks omitted). "The standard 'depends on the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* (quoting *Navarette v. California*, 572 U.S. 393, 402 (2014)) (emphasis altered). And "[c]ourts 'cannot reasonably demand scientific certainty . . . where none exists.'" *Id.* at 380 (quoting *Wardlow*, 528 U.S. at 125). Instead, courts "must permit officers to make 'commonsense judgments and inferences about human behavior.'" *Id.* at 380–81.

Even so, though, an "officer must be able to articulate more than an 'inchoate and unparticularized suspicion or "hunch"' of criminal activity." *Wardlow*, 528 U.S. at 123–24 (quoting *Terry*, 392 U.S. at 27). Yet "the level of suspicion the standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence . . . ." *Glover*, 589 U.S. at 380 (quoting *Navarette*, 572 U.S. at 397) (internal quotation marks omitted).

We must also remember that "[w]hen an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion . . . ." *Jackson*, 206 F.3d at 1166. To satisfy "arguable reasonable suspicion," we must evaluate whether "a reasonable officer could have believed that the [stop] comported with the Fourth Amendment." *Meshal v. Comm'r, Ga. Dep't of Pub. Safety*, 117 F.4th 1273, 1288 (11th Cir. 2024).

In sum, "we 'must examine the totality of the circumstances to determine whether an officer had a 'particularized and objective' basis to support his suspicion. Whether the officer's suspicion ends up being mistaken is immaterial so long as it was reasonable.'" *Id.* (quoting *Whittier v. Kobayashi*, 581 F.3d 1304, 1309 (11th Cir. 2009) (per curiam)).

This "'totality of the circumstances inquiry' . . . has no time limit." *Barnes*, 145 S. Ct. at 1358. "The history of the interaction, as well as other past circumstances known to the officer, . . . inform the reasonableness of the [Officers' actions]." *Id.* In other words, we can't "put on chronological blinders" and assess the arguable reasonableness of a seizure without proper "consideration of prior events" that led to the interaction. *See id.* at 1359.

With that in mind, we assess whether any reasonable officer could have had reasonable suspicion that Watkins was engaged in a crime. Construing the facts for Watkins, we think not.

First, before the events on the driveway, Watkins did nothing suspicious. The Officers were dispatched to 11 Bellamy Place;

Watkins was on a *separate property* across the cul-de-sac (30 Bellamy Place). She was calmly loading her car at her place of employment. And the Officers identify no evidence in the record that Bellamy Place was a "high crime area." On top of those facts, Officer Faulkner noticed separate suspects at 11 Bellamy Place near a different black vehicle on that property. So from the Officers' perspective, Watkins was not the suspect they were dispatched to confront.

Second, on this record, Watkins's flight from the Officers' approach cannot justify her stop. To be sure, the Supreme Court has recognized that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion." *Wardlow*, 528 U.S. at 124. And we have consistently recognized that flight or otherwise-suspicious behavior upon *recognizing* officers supports a finding of reasonable suspicion. *See, e.g.*, *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007); *United States v. Franklin*, 323 F.3d 1298, 1301–02 (11th Cir. 2003); *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir. 2002); *United States v. Gordon*, 231 F.3d 750, 756 (11th Cir. 2000).

But all bets are off when an officer fails to identify himself, and his status as an officer isn't obvious. Indeed, the Supreme Court has "held that when an officer insufficiently or unclearly identifies his office or his mission, the occupant's flight . . . must be regarded as ambiguous conduct." *Wong Sun v. United States*, 371 U.S. 471, 482 (1963). Consistently, we have clearly established that "officers cannot improperly provoke . . . a person into fleeing and use the flight to justify a stop." *Franklin*, 323 F.3d at 1302; *see also Jackson*, 206 F.3d at 1166 (finding no arguable reasonable suspicion

where the plaintiff ran when mistaking plain clothes officers for armed robbers).  The touchstone for evaluating flight is "whether a reasonable and innocent person facing this situation would have been caused to flee in the same manner . . . ."  *Franklin*, 323 F.3d at 1302.

No reasonable officer could find Watkins's brief "flight" suggested criminality.  The Officers approached Watkins in complete darkness except for their flashlights.  They had entered the cul-de-sac with sirens off; they were on foot when they advanced on Watkins; and they wore dark clothing under cover of night.  Officer Faulkner didn't make his identity known any better when he yelled, "Freeze!"  And both officers started shooting *without announcing that they were officers.*  A reasonable person, especially a 47-year-old woman alone in a desolate place at night, would worry she was being attacked and flee that scene.  That's not suspicious behavior; it's survival instincts.  And a reasonable officer would realize that.  So even though the Officers may not have meant to provoke Watkins's flight, they still did exactly that.  *Cf. Jackson*, 206 F.3d at 1166.  And they cannot use her provoked flight to justify the stop.  *Franklin*, 323 F.3d at 1302.

In one last try, the Officers argue that they had arguable reasonable suspicion to stop Watkins because they claim she almost hit Officer Davis with her car.  They point out Georgia courts have upheld convictions for assault when a suspect has driven directly at an officer to avoid detention.  *See, e.g.*, *Miller v. State*, 833 S.E.2d 142 (Ga. Ct. App. 2019) ("[T]he evidence shows that [the suspect] drove

the stolen white van directly toward Deputies . . . when they attempted to detain him, only missing them when they dove out of the way.").

But when we construe the record for Watkins for the purposes of summary judgment, we can't conclude that a reasonable officer would have suspected Watkins tried to hit Officer Davis with her car.

To start, there's a genuine question of material fact as to whether Officers Faulkner and Davis could have reasonably thought Officer Davis was visible to the naked eye in the center of the driveway. That is— there is a question as to whether a reasonable officer in Officer Faulkner and Davis's shoes would think Watkins saw Davis with enough time for her to process his location and change course.

The record contains several pieces of evidence that suggest no reasonable officer would think Davis visible. The driveway was covered in darkness. Officer Davis, wearing all black and a facemask, did not initially shine his flashlight at Watkins's car. Nor did he make so much as a peep. It was only Officer Faulkner who yelled. And as we've noted, he yelled only, "Hey, stop, freeze!"— which offered no indication of the location of Officer Davis.

We must resolve this question of fact in favor of Watkins. So we must assess the claim to qualified immunity as though neither Officer Faulkner nor Officer Davis could have reasonably thought Watkins could see Davis in the road. Besides that fact, Officer Davis was only close to the car's pathway because he

intentionally stepped in the center of the driveway that was the sole egress from 30 Bellamy Place. So under this version of the facts, Officer Davis alone caused any risk of a collision. And we think it common sense that an officer can't step in the middle of oncoming traffic, taking drivers unaware, and reasonably claim to be the victim of vehicular assault. *Cf. Kirby v. Duva*, 530 F.3d 475, 482–83 (6th Cir. 2008) (denying qualified immunity on an excessive-force claim and highlighting that an officer unreasonably "placed himself in potential danger by moving toward the rolling [car]"); *Estate of Starks v. Enyart*, 5 F.3d 230, 234 (7th Cir. 1993) ("The key dispute for the factfinder will be whether [the officer] stepped in front of [the suspect's] rapidly moving cab, leaving [the suspect] no time to brake. If he did, then [the officer] would have unreasonably created the encounter that ostensibly permitted the use of deadly force to protect him, because the decedent would have been unable to react in order to avoid presenting a deadly threat to [the officer].").

Plus, Watkins engaged in no erratic driving behavior suggesting she was *trying* to hit Officer Davis. So with proper "consideration of prior events," *Barnes*, 145 S. Ct. at 1359, and viewing the evidence in the light most favorable to Watkins, we think no reasonable officer would conclude Watkins spontaneously decided to hit Officer Davis with her car.

In fact, if Watkins had wanted to hit an officer, Officer Faulkner would have made the easier target—as any reasonable officer would've realized. He, unlike Officer Davis, revealed his location with his flashlight before Watkins started driving. Yet Watkins

drove up the other side of the driveway, away from Officer Faulkner. It's no wonder, then, that Officer Harris did not think Watkins intended to hit any officers.

Then to top it all off, a genuine dispute of material fact exists over whether Watkins's car even would have hit Officer Davis had he not moved. We must treat this dispute as though he would not have been hit by Watkins's car. Yet even absent this dispute, a reasonable jury could find no reasonable officer would think Watkins attempted vehicular assault. But that finding is especially likely if the jury finds, as it may, that Davis was never in danger.

At bottom, Watkins engaged in no behavior that a reasonable officer could find suspicious. So the Officers had no arguable reasonable suspicion for conducting their stop. That means they also had no arguable probable cause, the standard the Officers had to meet to support a claim of qualified immunity for an unlawful arrest. *See Skop*, 485 F.3d at 1137 (explaining the standard of "arguable probable cause," which is whether "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] *could have believed* that probable cause existed to arrest."); *Wardlow*, 528 U.S. at 123 (explaining reasonable suspicion is a less demanding standard than probable cause). For these reasons, they are not entitled to qualified immunity on Watkins's "seizure of person and unlawful detention" claim.

### C. The Officers are not entitled to qualified immunity on Watkins's excessive-force claim.

We move next to Watkins's excessive-force claim. The Officers argue that they are not liable on this claim for three reasons. First, they say that shots that miss a plaintiff's flesh can't sustain an excessive-force claim. Second, they assert they had probable cause to fire at Watkins based on an imminent threat of deadly harm. And third, they contend their use of force did not violate clearly established law. We are not persuaded.

We address the Officers' first argument summarily. All the cases the Officers cite to show a shot that misses a plaintiff's flesh can't sustain an excessive-force claim show only that a shoot–and–miss is not a physical-force seizure. *See Torres*, 592 U.S. at 318; *Hammett v. Paulding County*, 875 F.3d 1036, 1053 (11th Cir. 2017); *Carr v. Tatangelo*, 338 F.3d 1259, 1270–71 (11th Cir. 2003). They don't speak to the underlying merits of an excessive-force claim. *Cf. Flores*, 381 F.3d at 396–98 (allowing an analogous excessive-force claim where officers shot a plaintiff's car to move forward). And as we've already explained, the Officers seized Watkins both by physical force and a show of authority. *See* Part III.A, *supra*.

So we turn now to the merits of Watkins's excessive-force claim and whether the Officers are entitled to qualified immunity on it. We conclude they don't enjoy immunity against a claim that they unlawfully shot at her.

We typically evaluate whether an officer has unlawfully used deadly force by evaluating the factors *Tennessee v. Garner* outlines.

*See Powell v. Snook*, 25 F.4th 912, 922 (11th Cir. 2022). There, the Supreme Court held that "a police officer may use deadly force to seize a fleeing felony suspect when the officer: (1) 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm'; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible." *Vaughan v. Cox*, 343 F.3d at 1323, 1329–30 (11th Cir. 2003) (quoting *Garner*, 471 U.S. at 11–12) (emphasis altered).

But "*Garner* did not establish a magical on/off switch that triggers rigid preconditions whenever an officer's actions constitute 'deadly force.'" *Scott v. Harris*, 550 U.S. 372, 382 (2007). "The constitutional test for excessive force is necessarily fact specific." *McCullough v. Antolini*, 559 F.3d 1201, 1206 (11th Cir. 2009). And "in the end we must still slosh our way through the factbound morass of 'reasonableness.'" *Scott*, 550 U.S. at 383. In doing so, we again acknowledge the Supreme Court's recent guidance: we can't "put on chronological blinders" because "the history of the interaction, as well as other past circumstances known to the officer, . . . inform the reasonableness of the use of force." *Barnes*, 145 S. Ct. at 1358–59.

We start with the first *Garner* factor. From it, we have clearly established that "[a] police officer may not seize an unarmed, non-dangerous suspect by shooting him dead." *Garner*, 471 U.S. at 11.

For example, in *Gilmere v. City of Atlanta*, we held that an officer violated the Fourth Amendment when he used deadly force against an unarmed, intoxicated man who "did little to provoke the police officers to beat him." 774 F.2d 1495, 1502 (11th Cir. 1985) (en banc), *abrogated on other grounds by Graham v. Connor*, 490 U.S. 386 (1989). And in *Lundgren v. McDaniel*, we affirmed a judgment where a reasonable jury could find that officers used excessive force when "the officers without provocation shot at a nondangerous suspect." 814 F.2d 600, 603 (11th Cir. 1987). Similarly, in *Vaughan v. Cox*, we explained that "[u]nder *Garner*, a police officer can use deadly force to prevent the escape of a fleeing non-violent felony suspect only when the suspect poses an immediate threat of serious harm to police officers or others." 343 F.3d at 1332.

Still, this is a broad principle of clearly established law. *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (per curiam)) ("*Garner* . . . [is] 'cast at a high level of generality'"). And we have explained that "[t]he more general the statement of law is that puts the official on notice, the more egregious the violation must be before we will find that the official is not entitled to qualified immunity." *Goebert v. Lee County*, 510 F.3d 1312, 1330 (11th Cir. 2007); *see also Echols v. Lawton*, 913 F.3d 1313, 1324 (11th Cir. 2019) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1353 (11th Cir. 2002)) (A broad "principle 'must establish with obvious clarity that in the light of pre-existing law the unlawfulness of the official's conduct is apparent.'").

Yet the Officers' actions here were particularly egregious. As we've explained, the Officers lacked even *arguable reasonable suspicion* to stop Watkins for any crime, let alone probable cause to shoot her as posing a threat of harm. *See* Part III.B, *supra*. And just as "*Garner* involved a fleeing non-dangerous suspect in a non-violent crime," *Powell*, 25 F.4th at 923, here, Watkins was, at worst, also a non-dangerous suspect in a *non-violent crime*. In fact, we don't even see a basis for characterizing her as a suspect for the crime the officers responded to. *See* Part III.B, *supra*. After all, the initial crime for which the officers were dispatched was breaking into an unattended vehicle on a different property than Watkins's place of business.

The Officers also can't claim any support from the second or third *Garner* factors. Because Watkins obviously committed no crimes, the Officers couldn't have "reasonably believe[d] that the use of deadly force was necessary to prevent escape," as the second factor instructs us to evaluate. *Vaughan*, 343 F.3d at 1329–30 (internal quotation marks omitted). Nor did the Officers give *any* "warning about the possible use of deadly force" to satisfy the third *Garner* factor. *Id.* at 1330.

Watkins's alleged use of her car as a "weapon" also doesn't justify the Officers' shots on this record. True, we have before "upheld an officer's use of force and granted qualified immunity in cases where the [plaintiff] used or threatened to use his car as a weapon to endanger officers or civilians immediately preceding the officer's use of deadly force." *McCullough*, 559 F.3d at 1207. The

23-13616                Opinion of the Court                47

Officers offer several cases to support that point.  *See Baxter v. Santiago-Miranda,* 121 F.4th 873 (11th Cir. 2024); *Terrell v. Smith*, 668 F.3d 1244, 1253 (11th Cir. 2012); *McCullough*, 559 F.3d at 1208; *Singletary v. Vargas*, 804 F.3d 1174, 1182–83 (11th Cir. 2015); *Troupe*, 419 F.3d at 1168; *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005); *Pace v. Capobianco*, 283 F.3d 1275, 1282 (11th Cir. 2002); *Clemons v. Knight*, 662 F. App'x 725, 728 (11th Cir. 2016) (per curiam) (unpublished).

But this case is nothing like any of those.  Each of the cases the Officers cite involved a suspect who apparently disobeyed orders from clearly identified officers.  *Baxter*, 121 F. 4th at 880–81; *Terrell*, 668 F.3d at 1249; *McCullough*, 559 F.3d at 1207–08; *Singletary*, 804 F.3d at 1177–78, *Troupe*, 419 F.3d at 1168; *Robinson*, 415 F.3d at 1254; *Pace*, 283 F.3d at 1277–78; *Clemons*, 662 F. App'x at 726–27.  Again, though, the Officers here never identified themselves.  And they purposely chose to stealthily approach a person who was by herself in a dark, desolate area with only one means of egress.  Because on this record, no reasonable officer could have believed that Watkins was disobeying orders from clearly identified officers when she fled, these cases don't help the Officers.

Similarly, no reasonable officer could have believed that Watkins was using or intended to use her car as a weapon as she tried to escape what looked like a dangerous situation.  For that reason, the Officers also violated another principle of clearly established law in this circuit.  "[W]here the plaintiff did not use or did not threaten to use his car as a weapon, we have rejected an officer's

use of deadly force." *Morton v. Kirkwood*, 707 F.3d 1276, 1283 (11th Cir. 2013).

That's why in *Morton v. Kirkwood*, we denied qualified immunity on an excessive-force claim. There, the plaintiff was "an unarmed man in a stationary vehicle while [the officer had] no reason to believe that the man would place anyone's safety in danger." 707 F.3d at 1282. And in *Vaughan v. Cox*, we denied qualified immunity when the plaintiff claimed the driver of a stolen vehicle fled at 15 miles above the speed limit but otherwise did not drive erratically. 343 F.3d at 1326–27, 1330–33.

Watkins's case falls neatly within this line of our precedent. Watkins did not drive erratically but in a straight line out her only escape path. *Cf. Vaughan*, 343 F.3d at 1330 ("[T]he truck's lane was clear of traffic and [the suspect] made no aggressive moves to change lanes before [the officer] fired."). And she acted as any reasonable person in her position would have—she sought to get away from two men who were camouflaged in dark clothing and approached her in an isolated place without identifying themselves. She was not a suspect in any crime. *Cf. Morton*, 707 F.3d at 1283 ("In *Vaughan*, the driver was suspected of car theft; Morton was suspected of no crime."). And as we've explained, we must resolve the dispute of fact as to whether Officer Davis was ever even in the path of Watkins's car in Watkins's favor. Under that version of the facts, no one's life was at risk. *Cf. Vaughan*, 343 F.3d at 1330 ("[T]he record [doesn't] reflect that the suspects had menaced or were likely to menace others on the highway at the time of the

23-13616                Opinion of the Court                49

shooting."); *Morton*, 707 F.3d at 1283 ("Morton presented *less* of a safety and flight risk than the driver in *Vaughan* or the suspect in *Garner*.").   So at bottom, no reasonable officer could have believed it necessary to shoot Watkins to protect anyone from harm.[6]

Because the Officers' actions, in the light most favorable to Watkins, violated two principles of clearly established law in this circuit, they aren't entitled to qualified immunity on Watkins's excessive-force claim.

### D.  *The Officers are not entitled to qualified immunity on Watkins's unlawful-seizure-of-property claim.*

Next, we consider Watkins's claim for the unlawful seizure of property.  Watkins asserts that the Officers unlawfully damaged her car when they shot it four times.  The Officers argue that they are entitled to qualified immunity for three reasons.  First, they say they did not seize Watkins's car.  Second, the Officers assert that, in any case, they had probable cause to fire on Watkins's vehicle.

---

[6] The Officers also assert that "a plaintiff 'cannot establish a Fourth Amendment violation based merely on bad tactics that result in a deadly confrontation that could have been avoided.'"  *See Powell*, 25 F.4th at 922 (quoting *City & County of San Francisco v. Sheehan*, 575 U.S. 600, 615 (2015)).  But "bad tactics" are different from unreasonable actions.  And here, for the reasons we've explained, no reasonable officer would have done what the Officers did.  Without identifying themselves as officers or warning they would use deadly force, they approached a person who was alone in a dark and desolate place and started shooting when she fled.  That's not a poor strategic decision in the heat of confronting a threat.  Rather, it's reckless and unreasonable.

And third, they contend they didn't violate clearly established law. We disagree with each argument.

To begin, the Officers seized Watkins's SUV. A "seizure" of property "occurs when 'there is some meaningful interference with an individual's possessory interests in that property.'" *Soldal v. Cook County*, 506 U.S. 56, 61 (1992) (quoting *United States v. Jacobsen*, 466 U.S. 109, 113 (1984)). And in dicta, the Supreme Court has explained that "when speaking of property, '[f]rom the time of the founding to the present, the word 'seizure' has meant a 'taking possession.'" *Torres*, 592 U.S. at 312 (quoting *Hodari D.*, 499 U.S. at 624) (alteration in original).

We need not and do not decide whether officers seize a vehicle when they shoot it but do not fully wrest possession of it from its owner. That's so because here, the Officers separated Watkins from her car and took possession of it. As Watkins stopped her SUV and exited to submit to the Officers' authority, Officer Davis ordered Watkins to get down. And Officer Faulkner secured her person. In doing so, the Officers separated Watkins from her car and seized it.

To their credit, even the Officers concede that Watkins's car was seized. But they say the Georgia Bureau of Investigation seized it. And because Officers Yi and Harris separated the Officers from the investigation after four minutes from the initiation of the seizure, the Officers argue *they* did not seize the car.

We disagree. The Officers were involved with the interaction long enough to separate Watkins from her car, so they seized it.

Because the Officers seized Watkins's car, we must consider whether they violated clearly established law in doing so. "Generally, the seizure of personal property is per se unreasonable when not pursuant to a warrant issued upon probable cause." *Crocker v. Beatty*, 886 F.3d 1132, 1136 (11th Cir. 2018). But "[s]everal exceptions . . . exist to this general rule." *Id.*

One exception, which Defendants do not argue applies, is an "investigative detention" or *Terry* stop. "The bounds of investigative detention of personal property are defined by the limits applicable to the detention of a person." *United States v. Virden*, 488 F.3d 1317, 1321 (11th Cir. 2007). So "the factors used to determine whether a *Terry* stop has matured into an arrest are also useful in evaluating whether a seizure of property required probable cause." *Id.* But we've already explained why the *Terry* factors don't support finding an investigatory stop here. *See* Part III.B., *supra*.

The Officers instead rely on another exception to the warrant requirement. They argue the exigent-circumstances exception applies.

As its name suggests, "[t]he exigent-circumstances exception" allows for the seizure of property without a warrant "when certain exigencies exist . . . ." *Crocker*, 886 F.3d at 1136. "The most urgent of these exigencies is 'the need to protect or preserve life' in an emergency situation." *United States v. Timmann*, 741 F.3d 1170,

1178 (11th Cir. 2013) (quoting *United States v. Holloway*, 290 F.3d 1331, 1335 (11th Cir. 2002)).

But the same old problem prevents the Officers from being able to rely on the exigent-circumstances exception. When we view the evidence in the light most favorable to Watkins, she never put the Officers at risk of serious injury. *See* Part III.B & C, *supra*. That means the Officers seized Watkins's SUV without an applicable exception to the Fourth Amendment's warrant requirement.

As a result, they violated clearly established law. We have recognized that "[t]he right to be free from warrantless seizures of personal property, absent an applicable exception, was clearly established to the point of obvious clarity [as early as] 2012." *Crocker*, 886 F.3d at 1138. And "[t]he exigent circumstances exception was similarly clearly established . . . ." *Id.* So we are bound to deny qualified immunity to officers who seize property without such an exception "[e]ven in 'novel factual situations . . . .'" *Id.* (quoting *Jones v. Fransen*, 857 F.3d 843, 852 (11th Cir. 2017)). This is such a case. So we affirm the district court's denial of qualified immunity to the Officers on Watkins's property-damage claim.

## IV. CONCLUSION

For these reasons, we affirm the denial of summary judgment on qualified-immunity grounds and remand for further proceedings consistent with this opinion.

**AFFIRMED AND REMANDED.**